No. 142313 Knox Creek Coal Corporation v. Secretary of Labor Mr. Heath, whenever you're ready Good morning. Thank you. Good morning. I'm a police of court. I represent Knox Creek Coal in this matter. This is an appeal from the Federal Court of Appeals. This is a case that originally had over thirty-five citations before you're only four, thank goodness. Uh it was a one-week long trial and the ALJ found that the four violations in front of you were non-SNS and that was obviously reversed by the commission. We believe that all of them should have been affirmed under the substantial evidence test and really believe that you can resolve this case at that level. There is a second component to this case involving Chevron deference and actually more appropriately thanking Skidmore deference but don't believe you have to get to that issue simply based on the substantial evidence and the standards that were applied below. The commission basically used an argument that continued mining would have caused electrical problems without any proof of that. They basically have substituted their judgment for the judgment of the ALJ. The cleaning case, which is the accumulations, that's the fourth citation, basically involved an area that was already being had been found by the company in the pre-shift report. A cleaning crew was on the way. In fact, if you look at the timing of that, it was written at seven oh nine. It's abated at eight oh one in fifty-two minutes basically and the inspector said it took approximately forty, forty-five minutes of cleaning. That means the crew arrives somewhere within six of ten minutes of it being written and we believe the commission's reliance on cases that cleaning may not happen when a company says it's going to happen really doesn't apply here and the ALJ correctly looked at the facts. Well, the violation is letting it happen, not cleaning it up. That doesn't eliminate the violation. But it does due to part three of Mathis as to whether there's a substantial likelihood and that's where I'll kind of move into where we are on this. Permissibility, I think is already explained in the briefs, but it's about whether an electrical enclosure is sealed and how much of a gap exists. What we're dealing with there is methane. Anything below five percent, there's generally not enough methane. In fact, there isn't enough methane to ignite. Anything over fifteen percent, there's too much methane, not enough oxygen. So the range is five to fifteen percent. Congress, when it enacted the act, could have determined that all violations were SNS. It specifically did not do so and set up language that says you have to evaluate whether the violation could significantly and substantially contribute to the cause and effect of a mine safety hazard. Now, the commission has developed a test that has been in effect now since 1984 called Mathis. And we've obviously, both sides have quoted that extensively in the briefs. But if you look at the third element is the issue there, and that is whether there's a reasonable likelihood that the hazard caused by the violation will result in an injury. Just the fact that something could happen does not make it qualify under the third element under Mathis. And in fact, the commission said you have to look at normal mining operations, that you have to assume that the explosion could be a confluence of factors, but said that a reasonable likelihood the hazard contribute will result in an event in which there is an injury. That is actually the U.S. steel mining case in 1984 at the commission. What has happened here is, quite frankly, that the, you've got to show more than whether something could happen. In fact, in one of the cases that's decided by both sides, Wolf Run involving the Sago mine disaster actually, the commission sent it back to the judge and said, because he had said basically this could happen, I find it's SNS. They said no, it's got to be more than that, that you've actually got to be more precise in discussing what potential for various injuries existed under the Mathis analysis. And we believe that's exactly what the administrative law judge did here in the case below. You know, I just want to make sure I'm focused where you are. You started out by saying this is really Skidmore, not Chevron deference. And I don't quite follow that. That probably needs some help there. Because it seems to me from when you look at the Secretary of Labor's interpretation of this particular provision, it's pretty clear, at least to me, it doesn't seem like Congress has really spoken as to what this is. Therefore, the Chevron deference would kick in on it. And when you look at the interpretation they've rendered here, the case looks pretty straightforward to me. Actually, there are two prongs to this, basically. If it's resolved by substantial evidence, you don't have to get into the Chevron analysis and the deference issues there. The issue on Chevron versus Skidmore goes to, actually, there's a couple of cases here. The North Fork case, which was involving whether a minor on temporary reinstatement could continue to receive that when the Secretary decided not to pursue the case. And what the Sixth Circuit there held was that it's not really a Chevron deference issue. It's a Skidmore, which is a, the exact phrasing is a presumption of whether it should be, whether it's reasonable. The court there said the litigation position is a Skidmore analysis. This court in Power basically said, we don't have to decide which one we go to because both are met. And that's where that comes in. I think you only get to the second part here, and this deals with the litigation position that at hearing the Secretary attempted to argue through summary judgment that the judge had to presume that there was an explosion within the electrical containers. And there, because they couldn't prove that there was going to be one, quite frankly, the ALJ rejected that and said, Mathis has covered this for 30 plus years. We have a test here to look at whether there's a reasonable likelihood of an injury from this event. But you don't mean to suggest to you, I'm sorry for cutting you off mid-sentence, but just because the Commission disagreed with the ALJ doesn't mean that the Commission adopted the presumption that the Secretary was hurt. That's not your argument. I agree. It is not as clear in the record as we would like. We'll put it mildly. And I tried this case five years ago. The ALJ rejected it. The Secretary, it went to the Commission. The Commission quoted the position, and then goes on to do substantial deference. And of course, at brief, both sides have argued whether or not this presumption will be, whether you all want to even go there, actually, quite frankly. So I think- Right. You can, or reverse. Or reverse. Or reverse. Yes, sir. Under substantial evidence. Well, actually, to reverse, we'd have to reject any reliance on the presumption for you to win. No, I believe that under substantial evidence- Oh, okay. We can still win because- Okay, yeah. The Commission, it's not clear they actually relied upon this presumption the Secretary advanced. Similarly, in the briefing here, they've suggested to you that any violation of a safety standard is S&S. That's been rejected previously by the Commission. It's also been rejected by the Third Circuit in the Cumberland Lifeline case. So my view, and why I guess I'm getting somewhat off, is I'm seeing the substantial evidence question relevant to the findings of fact. And that what we are dealing with here is a dispute about the proper interpretation of the law. And so when we go to that third part of it that deals with the likelihood of injury, it looks to me as though that is something Congress has not spoken on. And in doing so, the agency has and rendered an interpretation. And it's that part that appears to me that Chevron deference should be accorded to because when we move away from the findings of fact and substantial evidence question, we're really here just dealing with a question of law. Lee, I agree with you. When you move away from substantial evidence, we're in- Which one? I'm sorry. I want to know what you agree with. Okay, that's why I'm trying to explain. Sorry, sir. That basically, when you get into the presumption, the question becomes, is it Chevron or is it Skidmore? And- Good question. That's where we're losing each other on. Okay. I'm not talking about substantial evidence. No. I'm talking about the question of law that looks like this dispute really hinges on. And that is an interpretation here by an agency where Congress has not spoken. The commission resolved the case under substantial evidence without getting to the presumption. That's what Judge Davis was referring to in his questions. Our position is that this was a litigation position adopted by the Secretary in the middle of this case through the summary judgment that was denied. And that is not entitled to Chevron deference. That is the Skidmore review, basically, that's recognized by this court and was used by the Sixth Circuit in the Northstar case. Again, that was a litigation position there that the individual should be entitled to continue to get temporary reinstatement. It's a pay while their safety case proceeds. And the court said that was not entitled to Chevron. Are we talking about the Mathis test? Yes. Well, we've gotten away from that, but yes, we are. Is that what you were responding to? I'm having a hard time following your argument. And this is obviously an area that you know better than I do. So I'm really looking to you for help. But I thought the Secretary in the briefs put out a reading of the statute which relied on statutory language that had been more or less ignored by the Mathis court. And it would seem to me that that wouldn't even be, I mean, maybe we're talking about deference, but maybe we're talking about what the statute requires. I mean, maybe it's Chevron 1. They went into the, first of all, I believe the same issue was looked at by the Third Circuit in the Cumberland case, and they determined that Chevron 1 did not resolve it. They had to go to a Chevron 2 analysis. That's interesting, but not to serve intent. Yes. They have gone into the legislative history about methane explosions and things of that nature that does not change the existing law that's been out there since 1984 as to what is the appropriate standard for an S&S violation. Well, Mathis requires injury, right? The statute doesn't. I mean, that doesn't seem to me to be so hard. Mathis requires a reasonable likelihood. Sorry, let me pull the exact line. There's a reasonable likelihood that the hazard caused by the violation will result in an injury. It's not an actual injury. It's a reasonable likelihood. Well, injury doesn't appear, though, in the statute. I'm sorry? Injury isn't in the statute. Oh, I'm sorry. You want to go back to the S&S 104? Yes. Well, see, you tell me where we are. I thought we were on the same page here. No, we're not. One, we believe the case can be resolved on the factual determinations made by the ALJ which were correct in the commission attempts to substitute its judgment. And both sides have briefed that heavily, but there's lots of discussion about how the wiring was multiple wrapped. The inspector admitted there was no likelihood of an immediate explosion. He saw no indication of a sparking, no electrical defects. The case, I believe, can be resolved right there by upholding the ALJ's opinion under substantial evidence which the commission did not follow. Now, when you move into the presumption, and I admit it gets a lot more confusing at that stage, the secretary has asked at the trial level that there be a presumption that there's an explosion in there so they don't have to address these issues about what's the probability. That there's a likelihood of an explosion. Exactly. That is a litigation position which I believe is not entitled to Chevron deference. It's Skidmore. If I still think it can be resolved under Chevron as well, because, quite frankly, it's not a reasonable position to be taking. Example here of a couple violations shows how this process works under Mathis and complies with the Act. There was an e-stop that was also in a sealed container that had a gap issue as well. The ALJ there found that because the way the switch operates, it can produce a spark. Therefore, there was an ignition source and he found that was S&S. He then looked at the other three violations extensively with experts from both sides plus witnesses from the company and the secretary, that there were no electrical issues inside the box, there was no evidence of any problem basically, and that what the secretary was trying to advance was that there could be something happening. That does not meet the Mathis test and I don't believe it also meets the Minax test for S&S either. That you have to show more than could. It has to comply with the statute. The statute controls. What I mean by that is if you want to adopt could, you don't need S&S. Every violation would be S&S. Obviously, Congress, by the language they chose, intended for there to be something shown more than just could. That's why we believe that you don't have to get into the presumption adopted by the secretary, but it is not appropriate under Chevron. I know we've kind of jumped around here on a number of states. If you look at the various cases cited, for instance, in Musser, which is the Mind Map case. In each of those, there was an event that could occur that would result in an injury. In this situation, looking at all the evidence presented below, there's nothing in these electrical enclosures that's going to create a spark. Which is necessary for a reasonable likelihood of an injury. And we believe the cases cited by the secretary are differentiated based on that. And that this case should be applied under substantial evidence. And that that's the appropriate standard. I realize we've jumped on a lot of different issues here, and I apologize. Well, and my only, and maybe I'll just have to kind of work it through. I don't think it's a question of whether or not, we know it should be applied by substantial evidence. The question is, what is a significant and substantial violation? Which is more of a question of law. It's not a question of trying to make a fine as a fact. And once you go there, you then determine, well, the statute doesn't tell you what it is. So then you go to see, well, has the agency spoken to this? And I say they have. And so if they've spoken to it, then to what extent, then how does that affect us? We give it Chevron deference. Which sort of walks us to where we are. That's, I mean, that might sound simplistic, but I really kind of see, it's one thing to say, well, there is substantial evidence. But the question is, what is substantial? What constitutes significant and substantial violation here, so to speak? What is that? And then Congress doesn't tell you. So then the agency does. And it kind of tells you how to do it. And so when it does what is done there, then we review it. It comes to us. Our deference review is Chevron. The Mathis test has been used by the court, by the commission, since 84. This court, I know at least in Eagle Energy, recognized it. I'm not aware if this court's actually adopted Mathis formally. Other courts have and recognized as the standard. And that is the, there's a reasonable likelihood that the hazard caused by the violation will result in injury. Make sure I understand. The Mathis test arose because Congress had not spoken on this. And the agency which had been delegated the authority to articulate a test did speak. The Mathis test arose in 1984 when the Mine Act was less than 6 years old. And it's been applied by all parties since that time. The argument that all, just for example, the argument that all violations are S&S was rejected by a case in the same time period, by the way. That's the Consol Energy case that's before you. That was tried again in Cumberland. And again, the court said, no, not every violation is going to be S&S. Cumberland, I think, is a unique case in that it was dealing with lifelines under a new provision of the Miner Act from 2006, sort of a case in first impression as to what would be the standard for emergency escapeway standards and whether you would have to presume a use of those. This case, yes, there is in the Mine Act about methane and other things going back to the 1977 or the 69 Act. Still, the law, methane and electrical permissibility had always been treated under the Mathis test as a routine S&S determination. And I don't believe there's any reason to change that based on a litigation position taken by counsel. And that's why I don't believe it's entitled to Chevron deference. It's Skidmore. And whether it's persuasive. And if you look through the fact pattern, I don't believe it is here. Okay. Thank you very much.  Thank you. Mr. Mayor. Thank you. May it please the court. Philip Mayor on behalf of the Secretary of Labor. Judge Wynn, you're exactly right. This is not a case about substantial evidence. This is a case about the interpretation of the significant and substantial language in Section 104D. Explain how this, I'm just confused in how we get to Skidmore. I understand it almost as though, well, this is not really the question because this particular item has been ruled to be what it is. And therefore, since it's what it is, you don't need a deference. You don't need to do deference on the Chevron level. So the reason that we're talking about deference is because we have a statutory interpretation question about the meaning of Section 104D. This court, like the D.C. Circuit and the Eighth Circuit, has, the Secretary thinks, held that the appropriate deference is Chevron deference when the Secretary has asserted a statutory interpretation through the fact of issuing a citation and then through maintaining a consistent interpretation of the statute throughout the course of litigation. That has been done in this case. Which is exactly what has been done in this case. That's what the Walmsley case said. And this court reiterated that the Secretary is the policymaking entity who's entitled to deference in the speed mining case. Where did the Mattheis case come from? Was the Secretary espousing that as a statutory interpretation at the time? So the Mattheis case, at the time the Secretary was urging, was not urging the Mattheis test. It was urging a more, a test that would result in more S&S citations that is actually founded in the statutory, the legislative history. The same test that you're espousing now? Not the same test that we are espousing now. A more generous to the Secretary test. Mattheis has been around since 1984. That was rejected. The Supreme Court decides it is the Supreme Court, right? No, the Supreme Court has not. What is Mattheis? Mattheis is a commission decision. Okay, so Mattheis is a commission decision. So that they come to some interpretation that the Secretary does not feel is the correct interpretation. And the Secretary is espousing a interpretation here, as you just told Judge Wynn, that the Secretary has consistently done through this litigation, right? Is this the first time the Secretary has espoused this interpretation? Absolutely not. The Secretary has, across multiple types of different citations, consistently urged that in, let me back up one second. Sure. The Secretary isn't challenging the Mattheis test at this time. We think that the correct result here follows from a correct application of the third prong of the Mattheis test, as the commission has explained it, and as in the Musser case and the Black Beauty case, the cases we cite at pages 27 through 29 of our brief. Under that application of the Mattheis test, it's appropriate to ask if there is a, the question at step three is whether or not there's a reasonable likelihood that the hazard contributed to will result in an injury. And what Knox Creek is urging is that the Secretary be required to prove that the violation itself has a reasonable likelihood of resulting in an injury. The Secretary has consistently opposed that interpretation. It's what the Secretary did in the Musser case. It's what the Secretary did in the Cumberland Cole case. It's what the Secretary did in the Consolidated Cole case. And counsel, for the first time in reply, brings up the Wolf Run case as hostile to the Secretary's position. But that omits the subsequent history of the Wolf Run case. Wolf Run was a case about lightning arresters, and the question was whether or not it was S&S to have inappropriately maintained lightning arresters. The decision that Knox Creek cites in its reply brief is the commission's first cut at that. And the commission remanded to the administrative law judge for further determination of the S&S status of those lightning violations. On remand, the administrative law judge said exactly what Knox Creek is saying here. Applying math. Excuse me? Applying math. Applying mathies. And said, lightning strikes aren't very common, so there's no reasonable likelihood of an injury because there's no reasonable likelihood of lightning strikes. The Secretary appealed that decision to the commission, and the commission rejected that position unanimously. In a 2-2 decision, they split on the rationale, two commissioners agreeing with the Secretary's position that there should actually be a presumption of lightning, and two commissioners rendering a slightly softer version of that. That case, and I apologize that we haven't been able to cite it because Wolf Run came up for the first time in reply, is 36 FM Schrick 1951. All of this is to come back to your question, Judge Motz. The Secretary has consistently maintained an interpretation of Prong 3 of mathies, which is really what's at stake here. You're not wrong in the questions that you posed to my friend about whether or not the mathies test itself follows entirely obviously from the text of the Mine Act. So today, you're not making that argument? Today, we are not making that argument. That's correct. That would probably be a permissible argument for the Secretary to make, but it is not the argument that the Secretary is making today. But it is worth reflecting on the text because it speaks to the reasonability of the Secretary's interpretation of Prong 3 of mathies. Judge Motz, as you observed, the text of the statute requires only that such violation be of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard. I don't think there's any question that the permissibility violations at issue here would satisfy that text. The Secretary proved that hot gas could escape from these enclosures if there were to be an explosion in the interior of the enclosures. The Secretary proved that there was a possibility of an explosion inside the enclosures. And Knox Creek did not challenge that finding, the possibility of an explosion or the possibility of an escape. And so it's prohibited from doing so now, not that any challenge under substantial evidence review would survive anyways. Well, if we adopted your view, would it be the result that there'd be an automatic finding that permissibility violations in gassy mines are significant and substantial? It is likely that in the vast majority of cases a gassy mine permissibility violation would turn out to be S&S, which is not very surprising because Knox Creek has not pointed to any decision by the Commission in which a permissibility violation in a gassy mine has not been found to be S&S. And Knox Creek points to the Texas Gulf decision and the Secretary is not disagreeing with the Texas Gulf decision. That case actually involved allegations both that the Secretary had not shown that there would be a high possibility of sparking or arcing and also that the Secretary had not shown the degree of methane emission that would happen in the mine. And what the Commission said, it didn't talk about the sparking or arcing. It said, quote, the appropriate question is whether there's a reasonable likelihood of a sudden liberation of methane. So, as a matter of fact, there might be very fact-specific ways that an operator would not be liable, or would not be significantly and substantially liable in a gassy mine for a permissibility violation. Perhaps it would be in an area where there were no miners present, or there were no miners expected to be present, so there wouldn't be a likelihood of an injury. You know, some enclosure had been left lying around a defunct part of the mine or something like that. So it wouldn't be automatic, but you're right to say that it would be true in most cases. But I think that's a feature, not a bug, of the Secretary's interpretation. Because as you observed, Judge Motz, the statutory text is expansive. And the Matthews test, while it may be slightly less expansive than the text itself, is not intended to create an onerous burden for the Secretary. And the Commission's recent decisions, that I keep referencing, the Musser, Black Beauty, and Cumberland Coal and Consolidation Coal decisions, make that really clear. I think it's worth spending at least a moment on the Black Beauty decision, which is the Berm decision that we talked about in our brief, which was affirmed by the Seventh Circuit under the name of Peabody Midwest Coal. In that case, just as here, an operator argued that the Secretary had not carried his burden of demonstrating that a violation was S&S, because the violation at issue there was having berms along the side of a road that had excavation equipment on it. The operator presented evidence that it wasn't very likely that any trucks would actually go off this road, because no trucks had driven close to the edge or weren't particularly likely to do so, and said, because it's not reasonably likely that someone's actually going to drive off the edge, step three of Matthees isn't satisfied. The Commission rejected that argument and said, and I quote, the relevant question is not whether the lack of berms is reasonably likely to cause injury. Instead, it is whether the hazard in question, a vehicle veering off the road because of a lack of berms, would be reasonably likely to cause injury. The exact same logic here renders the permissibility violations S&S. The question isn't whether or not it was reasonably likely that there would be an explosion inside the enclosure. The standard is designed to prevent against explosions inside the enclosure, and explosions are supposed to be unlikely inside electrical enclosures. The question here is whether that hazard, dangerously hot gas escaping because the enclosure was not permissibly maintained, would be likely to cause an injury. And here, because this was a gassy mine, and because there were miners nearby, that test is met. The Seventh Circuit affirmed the Black Beauty decision I just referenced in almost identical. If we didn't adopt your proposed assumption, how would we affirm? Wouldn't we be reweighing evidence? Absolutely not. I mean, the Secretary does believe the best way is to affirm the position. But I know you make alternative arguments. I understand. But the question does not become a substantial evidence question after that. I think that it's pretty clear that there's an alternative holding in the Commission's opinion, basically saying that it has a confluence of factors test that it has used in a lot of cases to determine whether or not violations that pose a risk of fire in a mine are S&S. And the Commission cited a number of cases. We've summarized them at page 44 of our brief, in which the Secretary had proven a potential ignition and a permissibility violation is a potential ignition source and gas in the mine, and found that to be sufficient to satisfy the confluence of factors test. Knox Creek, as I mentioned earlier, has not cited a single case in which the Commission found a potential of ignition in a non-gassy mine to be not S&S. The closest thing is another case that Knox Creek raises for the first time in its reply brief, the Ziegler Coal case. And we haven't had a chance to address that case either, so I'd like to do so briefly. In that case, the Commission said that the Secretary had basically proven nothing but a could, had proven that there could be a spark, that there could be methane, and remanded to the ALJ for further determination. As we read that decision, like the Texas Gulf decision, that's about the Secretary not proving a reasonable likelihood of methane, which makes it not reasonably likely that there could be an injury in the event of hot gas escaping from an impermissible enclosure. If the Court has any doubts that that is the Commission's understanding of the Ziegler Coal case, the Commission has said exactly that. In a case called Excel Mining, which is at 37 FM-459, footnote 5 of that decision, which postdates the Commission's decision in Knox Creek, the Commission has distinguished Ziegler Coal on exactly the grounds that I just did. I did want to address briefly Chevron deference. Judge Winn, I think you, I did speak to this a bit earlier, are correct that Chevron deference is what this Court has said applies. But even if this Court were to have questions about whether or not that's the law, and I think that the Walmsley decision doesn't leave much question for that, then if there were to be Skidmore deference, all of the arguments the Secretary has made about the statutory text, about the fact that it would be counterintuitive to require proof of an event which is supposed to be unlikely in order to establish that a dangerous violation is S&S, would apply with equal force, because under Skidmore deference, you would owe deference to the Secretary to the extent his position has the power to influence. If there's no further questions on the permissibility violations, then I'll turn to the accumulations violations briefly. I think the accumulations violation is relatively straightforward. Knox Creek has not acknowledged, let alone attempted to distinguish, the Commission's U.S. Steel decision, in which it held that, and I quote, a determination of significant and substantial must be made at the time the citation is issued, parentheses, without any assumptions as to abatement, but in the context of continued mining operations. That, without any assumptions as to abatement, is precisely what the Commission applied here. It recognized that there were miners en route, or potentially miners en route, to clean up the violation, but said, it didn't disagree with the judge's fact-finding. It didn't say, we don't believe that the miners were coming. It said that we cannot assume, for purposes of the S&S analysis, as a matter of law, that miners are coming to clean up a violation. As we explain in our brief, that interpretation of what constitutes S&S is grounded in excellent policy motive of that, quite simply, miners don't always do what they're told, they don't always do it properly, and to require the Secretary to prove that abatement would not have happened in this case, that might have been one thing, but in general, that would require the Secretary to prove a negative, i.e. that the operator wouldn't have found and abated a violation in a reasonable time. What if the inspector was there when it was abated? If the inspector was there when it was abated? There's actually a case on exactly that question, it's Elkhorn-McCoy, which we cite in our brief, and even in that case, the Commission held that abatement of an accumulation violation that was in process while the inspector was there was not enough to undercut the S&S finding. That said, the Commission, in this case, with respect to another violation, a power cable violation, did hold that a piece of equipment that was completely out of operation, the operator had, the Knox Creek had taken it out of operation and had said, it's not coming back on until we have a machine. But in that case, it wouldn't be S&S. I thought the language was assumption of? Without any assumption as to abatement. And of course, if you're there, you know there's no assumption. I mean, you have to assume. I guess that's what the argument would be. That would be. A cousin of that is the argument that they're making now. Right. I don't think that the court needs to reach the question of what would happen if active abatement was ongoing at the time the inspector was there. There was a citation in this case that raised that issue. The secretary lost. We haven't appealed that decision. Right. So I don't think you need to address it in your decision. It's sufficient to say here what the Commission unanimously said, which is that when abatement has not actively begun, when the operator has not taken the dangerous situation out of commission, hasn't roped it off or said we're not operating this, then that doesn't affect the S&S analysis. If the court has no further questions, I'll cede the rest of my time. I think we're fine. Thank you. Counsel, am I correct that only $55,000 is at stake here? Yes. And is there something else I should know about these violations? Both sides discussed this. S&S drives a lot of things, including an increased penalty, which is not as substantial here. But the other thing is something called pattern of violations in which there are pattern orders that are issued. And you're all a little familiar with the Brody case that's already been here at one time. I'm not sure there was something. That is one of the major drivers here. And mines are evaluated on what is S&S, the number of S&S violations, which is why operators fight all of them. Well, don't fight all of them. Fight the ones you know that should not be S&S because they're going to cause potentially your mine to go on a pattern. And that has dramatic effects on the operation. I would just like to hit on the belt issue very quickly. As you stated, the inspector was there. He watched. The belt is only running, and this is in both briefs, because the inspector asked him to turn it on so that he could inspect it on an off shift. It was found at 6.30. A crew was being dispatched to clean up the accumulations with a high-pressure water hose, as noted by the inspector in the abatement form. So within about six or seven minutes, 15 after, 20 after, they're cleaning it up. They're prying high-pressure water hose to the area. He already stated there was no smoke. There was no heat. There was no indication of ignition going on here. Factually, there's no likelihood of an injury here. And in fact, it's established in the record that the production starts at 7.30. So this is even being cleaned up before the belt's going to begin to be used for production. So I think it's more aligned, quite frankly, with the belt, the electrical line that was out of service. But it wasn't technically out of service because the inspector wanted it turned on to be run. And I think that clearly, under substantial evidence, the ALJ was correct there. The ALJ, as quoted by both sides in remand, again noted how this was not the proper test for S&S here. And he's a former chief administrative law judge for the commission and has been doing this for about 30 years. So that, I believe, quickly, or basically, that needs to be reversed on the belt. I believe that on the presumption, yes, they have argued various points on, first of all, they've agreed math this applies. Second, this idea of presuming an explosion in the electrical container is a new position. That's not something, if you look at the other cases cited, you don't see that presumption being raised before. So this is a new position. I don't believe it is. I believe it is more skidmore based on a litigation position that's been adopted. It's certainly not what Congress intended. As you noted, most all violations would end up being S&S. And if Congress intended that, they would not have written the Mine Act the way it's written. You have a case where when you have this S&S violation under these circumstances? I'm sorry? Do you have a case, there was a representation by the Secretary that you had no case where there wouldn't be an S&S violation under these circumstances? I cannot say that we've gone through 40 years of Mine Act. Not one I can point to you right now. But I just because there hasn't been a case come up with the right fact pattern, I don't believe it makes that result either. In conclusion, we believe that under substantial evidence all four violations should be overturned. The ALJ made the correct determination here in looking at all the evidence and the facts that there is no reason to adopt this new presumption that the Secretary is advancing presumably an explosion inside there and that as applied, the Mathis test here means these are non-S&S violations. Thank you very much. We will ask our clerk to adjourn court and then we will come down and greet the lawyers. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diana Gribbon Motz, James A. Wynn, Jr., Andre M. Davis